QUIMBY v. CLOCK et al.

(Supreme Court, Appellate Division, Second Department.   October 10, 1899.)

1. DEEDS—CANCELLATION—FRAUD—EVIDENCE.

In an action to set aside a deed executed by plaintiff to defendants, on the ground of fraud, plaintiff testified that she did not intend to execute the deed, and did not know that she had executed it, until informed of the fact by a newspaper, over a week after the transaction. The evidence showed that the negotiations, which resulted in a transfer of title of valuable property without adequate, if any, consideration, were conducted on the one side by one of defendants, an experienced real-estate broker, acting under the advice of his lawyer, and on the other side by plaintiff and her father, an old man, with little business experience, who were advised by and relied on plaintiff's husband, who was unworthy of trust, and to whom defendants were to pay a commission on the conclusion of the bargain, without plaintiff's knowledge. *Held*, that plaintiff was entitled to have the deed set aside.

2. JUDGMENT AGAINST PERSON NOT A PARTY.

In an action to set aside a deed for fraud, the court has no power to set aside a contract for the sale of the property, executed by a person not a party to the suit, to defendants, though there is an amendment to the prayer of the complaint asking that such contract be set aside.

Appeal from special term, Richmond county.

Action by Minnie E. Quimby against Edgar S. Clock and others to set aside a deed. There was a judgment in favor of plaintiff, and defendants appeal. Modified.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and WOODWARD, JJ.

Frank Harvey Field, for appellants.
Charles W. Coleman, for respondent.

GOODRICH, P. J.   This action was brought to cancel and set aside a deed executed by the plaintiff to the defendants, dated August 23, 1897, and conveying about 35 acres of land at Tottenville, Staten Island.   By an amendment ordered at the trial, the prayer for judgment covers a contract for the sale of the same property, dated August 16, 1897, and executed by Cornelius C. Ellis to the defendants.   Mr. Ellis, the original owner of the property, was 74 years of age, and had been a sea captain, though not engaged in that pursuit for 10 years previously to the date of these transactions. The defendants Edgar S. Clock and Joseph R. Stein were real-estate brokers, having an office in the city of New York.   The plaintiff in this action is the daughter of Capt. Ellis and the wife of Milton E. Quimby.   Previously to the date of the contract, there were negotiations between Quimby, Capt. Ellis, and the defendant Stein, looking towards the purchase of the property in question, which culminated in the contract by which Ellis was to sell the property to the defendants for the sum of $60,000, the defendants to take title subject to mortgages aggregating that sum.   The mortgages were to contain clauses providing for the release of any lots at specified rates. Ellis was to procure maps and a survey of the land into lots, the expense of which was to be added to the amount of the mortgage, and was to procure releases of the lots from mortgages as they were

sold. He was also to pay the taxes and interest on the mortgages for five years. At this point the statements of the parties diverge. The plaintiff furnished evidence that the agreement between Capt. Ellis and the defendants was that the former was to receive $15,000 in cash before any deed was executed. This is denied by the defendants. But it is not denied that, at the time of the execution of this contract, Capt. Ellis required the payment of something on account of the contract; whereupon the defendant Stein took from his desk a blank note, signed by a Mrs. Clows, who seems to be a mythical sort of personage, and filled it up as a note of $1,000, payable to the order of Capt. Ellis, telling him that he could take it to his bank and obtain the money on it. This the captain endeavored to do, but the bank refused, and he returned to the office of the defendants, who, for the purpose of helping him to obtain the money, gave him a letter certifying to the responsibility of Mrs. Clows. He again called at the bank, which again refused to discount the note; whereupon he returned to the defendants' office, threw the note upon the table, and refused to have anything further to do with the transaction. For the time being this seems to have suspended or terminated the arrangement between the parties. Subsequently negotiations were resumed, but, according to testimony offered by the plaintiff, the captain refused to go any further with the transaction unless he received a cash payment of $15,000. The defendants then suggested to him that he should execute a deed of the property to some person, who could in turn execute a mortgage to him for the sum of $60,000, and that, when the $15,000 was paid, a deed could be executed to the defendants by the person thus holding the title. There was testimony on the part of the defendants absolutely contradicting this agreement. They claimed that Capt. Ellis entered into an agreement with them by which the premises were to be conveyed to his daughter, Mrs. Quimby; that she was to execute to him a mortgage for $60,000, and immediately convey to them the premises subject to such mortgage,—it being their intention to exploit the property by cutting it up into lots, and to sell them free and clear of incumbrances, for which purpose the plaintiff was to procure partial releases of the lots thus sold from the general mortgage; that, in pursuance of this plan, photographs and maps of the property were made by the defendants at considerable expense; and that efforts were made by them looking to a sale of the property in lots, as they had intended when the purchase was made. Whatever was the real agreement between the parties, they met at the defendants' office on August 23d, in an interview lasting for several hours. Both parties agreed that the deed of Capt. Ellis to Mrs. Quimby, and the mortgage of the latter to him, were executed, but the parties differ diametrically again as to other matters. At that interview, a deed executed by the plaintiff, and conveying the property to the defendants, as well as the deed to the plaintiff and her mortgage, were acknowledged, and sent to the office of the county clerk of the county of Richmond to be recorded, and they were recorded on the following day. The plaintiff, however, furnished evidence of herself, her father,

and her husband to the effect that, while three papers were executed, such papers were the deed to the plaintiff, her mortgage, and what she supposed was a bond to accompany it. On the other hand, the defendants furnished evidence that there was no bond, although one was recited in the mortgage, but that the three papers were the two deeds and the mortgage, and that the same were read over to the plaintiff and Capt. Ellis, were executed by them, and acknowledged before a notary public.

Upon this conflict of evidence, the learned trial judge before whom the action was tried made the following decision:

"I decide for the plaintiff, upon the ground that neither she nor Ellis intended that the deed of August 23d should be given, and that neither knew that it had been executed. Both the contract of August 16th and the deed of August 23d are without consideration, one-sided, and inequitable. Ellis was an old sailor, and careless in his business methods. The plaintiff was entirely without business experience. Both relied upon Quimby and Hallet T. Clock,—particularly on Quimby, who was not careful of their interest, but favored the dealings with Clock & Stein and Ellis, for his own purposes. Inasmuch as all the transactions between Clock & Stein, the plaintiff, and Ellis were before the court, and the facts concerning both contract and deed freely gone into by both sides, plaintiff's motion to amend her complaint should be granted. There should be judgment for the plaintiff setting aside both contract and deed, with costs. A motion for an allowance may be made on the settlement of the decree."

There was evidence tending to show that after the negotiations commenced Stein introduced to Capt. Ellis, not the defendant Clock, his partner, but an old gentleman, Hallet T. Clock, father of his partner, an old sea captain of about the age of Capt. Ellis, who supposed that he was one of the persons to whom he was selling the property, and that Capt. Ellis had been previously acquainted with, and had confidence in, him. Capt. Ellis and the plaintiff were not represented by counsel at any time previous to the recording of the deeds and mortgage, but the plaintiff's husband assisted in the negotiations, and was present when the contract and deeds and mortgage were executed. From the course of the trial, we may assume that there were circumstances in the life of Mr. Quimby which made him unworthy of the confidence which Capt. Ellis and the plaintiff reposed in him. He refused to answer whether he had been convicted of forgery, and had served a term in the state prison in New Jersey, on the ground that it would injure his business, and tend to degrade him. We do not lose sight of the fact that it is probable that Capt. Ellis and the plaintiff knew the previous history of Mr. Quimby, but Stein testified that before the execution of the contract he was informed by Capt. Clock that Quimby was a "crook" and "a scoundrel," and yet he admits that before the transaction was consummated he agreed to pay him a commission of $350 for securing the property, and that he afterwards paid him money on account of such agreement. Such agreement constituted Quimby, in a certain sense, the agent of the defendants, and placed the parties on an unequal footing, as there is no evidence that Ellis or the plaintiff had any knowledge of such fact. We have a negotiation conducted on the one side by an experienced real-estate broker, acting under the advice of his

lawyer, and on the other side an old man and his daughter with little business experience, advised by or relying upon a bribed agent and a deceptive friend; the result of the negotiation being a transfer of the title of valuable property without adequate, if any, consideration.

In Frankel v. Wathen, 58 Hun, 543, 12 N. Y. Supp. 591, the court cited with approval the language of Lord Cranworth in Railway Co. v. Blakie, 1 Macq. 461, where he said:

"An agent has duties to discharge of a fiduciary character towards his principal; and it is a rule of universal application that no one having such duties to discharge shall be allowed to enter into engagements in which he has, or can have, personal interests conflicting, or which possibly may conflict, with the interests of those whom he is bound to protect. So strictly is this rule adhered to that no question is allowed to be raised as to the fairness or unfairness of a contract so entered into."

It has been repeatedly held, as in Claflin v. Bank, 25 N. Y. 293:

"That a trustee or agent shall not act for his own benefit in any matter relating to his agency or trust is an old and familiar doctrine of the court of equity, frequently asserted in the courts of this country and in England. The rule is applicable to all persons standing in a trust relation. The principal is entitled to the exercise in his behalf of all the skill, industry, and ability of his agent, and to his intensest fidelity to his trusts."

This was a case to recover commissions for services as a broker, but later we shall apply its effect to the case at bar.

In Murray v. Beard, 102 N. Y. 505, 7 N. E. 553, the plaintiff, knowing that a corporation was about to build a pier and to advertise for bids from timber merchants, visited several such merchants, and obtained a promise from each that, if he secured the bid, the plaintiff should receive a commission. The defendant obtained a contract for furnishing the material, but refused to pay the broker's commission, and the court sustained him in such refusal, saying:

"The plaintiff, while assuming to act for the defendant in obtaining the contract of sale, was in fact under equal obligations to competing dealers to assist them in effecting the same sale. Thus, if the plaintiff's services could have been of advantage to any one, he was under the necessity of being treacherous to one employer or another. An agent is held to uberrima fides in his dealings with his principal, and if he acts adversely to his employer in any part of the transaction, or omits to disclose any interest which would naturally influence his conduct in dealing with the subject of the employment, it amounts to such a fraud upon the principal as to forfeit any right to compensation for services. [Citing cases.] It is an elementary principle that an agent cannot take upon himself incompatible duties and characters, and act in a transaction where he has an adverse interest or employment. [Citing cases.] In such a case he must necessarily be unfaithful to one or the other, as the duties which he owes to his respective principals are conflicting, and incapable of faithful performance by the same person."

While the last two cases relate to actions by brokers for commissions, the principle involved is of wider application, and clearly governs the case at bar, for the defendants were in pari delicto with Quimby. As he could have reaped no benefit for any services which he rendered to the grantors, by reason of his secret and unjust dealings with the defendants, so they cannot reap any benefit from a contract into which Ellis and the plaintiff were induced to enter by the use of Quimby's influence with them.

There was another significant piece of evidence given by the defendant Stein, which must have had weight with the learned trial court. Stein testified that after the time when he says the title was passed a proposed agreement between Androvette, the holder of the first mortgage, and Capt. Ellis, was drawn, and given to Ellis, to obtain the signature of Androvette. This document was designed to secure Androvette's release of lots from his mortgage whenever they should be sold. It contains the following sentence: "Whereas, the said party of the second part (Capt. Ellis) is about to convey the said mortgaged premises to Clock & Stein." This paper was given by Stein to Ellis, inclosed in an envelope, addressed to Clock & Stein, so that it might, when executed by Androvette, be returned to the defendants. The clause cited is confirmation of the fact that the plaintiff had not then conveyed, and had not intended to convey, the property to the defendants at the time when the deed to her and the mortgage by her to her father were executed.

There will be found in the evidence an air of mystery as to Capt. Clock and Mrs. Clows, and their relations to the defendants, which might have been dispelled by their appearance as witnesses, and also by the examination of the defendant Clock, and the court below was justified in drawing serious inferences against the character of the transaction by reason of the failure of the defendants to examine either of such persons as witnesses. The plaintiff's belief that Capt. Clock was one of the firm is evidenced by the fact that the summons in this action was originally served on Capt. Clock, on the supposition that he was a partner, and necessarily a party defendant; such service being set aside on the motion of the defendants' attorney, on the ground that Capt. Clock was not a member of the firm, and consequently not a proper party defendant. Sometimes light is thrown backward on transactions of this character. The defendant Stein admits that after this action was commenced the defendants conveyed the property to one Strauss; that he did not know who Strauss was, and had never seen him; that he knew that he was an infant; that he sold the deed to a party for the sum of $250, on "the understanding that 40 per cent. which the property may hereafter realize in profits shall be returned to Clock & Stein"; and that the deed was given with a blank for the name of the grantee, which he afterwards filled in with the name of Strauss. There can be no doubt as to the purpose of the defendant Stein in this conveyance, and it sheds a baleful light upon the original transaction.

The plaintiff contends, and furnished evidence to show, that she did not intend to execute, and did not know that she had executed, any deed of the property to the defendants, until informed of that fact by a Staten Island newspaper, dated September 1st, and which she saw a day or two thereafter, in which the fact of the deed was published. Shortly after, she and her counsel had an interview with the defendant Stein, in which she stated that she had never intended, and never had executed, such a deed, and repudiated the same. Whether or not there was fraud on the part of the defendants in procuring the execution of the deed to them,—and there is abundant evidence to justify the belief that there was,—it is clear that the

property of the plaintiff has been transferred from her to the defendants without any consideration whatever. Not only was no cash paid, but Capt. Ellis or the plaintiff was made to agree to bear the expense of surveying the property, and to pay the interest on the mortgage and the taxes for the term of five years, while the defendants were to enter into possession of the property. Capt. Ellis was an aged man, and his testimony discloses a failing memory. He was induced to rely on the belief that one of the persons with whom he was dealing, like himself, was an old sea captain, with whom he had been acquainted in his earlier years. In some measure he relied also on the advice of his son-in-law, to whom the defendants were paying money for commissions conditional upon the conclusion of the bargain. There is evidence sufficient to justify the conclusion that the defendant Stein was taking undue advantage of the plaintiff and her father, and that he knew that they were relying on the belief that the former was dealing with Capt. Clock as a partner in the defendants' firm, and on the advice of Quimby, whom the defendants knew to be unworthy of trust, and to whom they were paying commissions in connection with the purchase. It is not necessary to cite authorities to sustain the proposition that a court of equity will set aside such a transaction.

While, however, there was at the trial an amendment of the prayer of the complaint, asking that the contract executed by Capt. Ellis to the defendant firm be set aside, there was no amendment of the papers by which Capt. Ellis was made a party, either plaintiff or defendant; and, while from the facts we may believe that he would assent to setting aside the contract, the court below had no power to make such a judgment in a suit in which he was not a party. To this extent the judgment should be modified, and as modified affirmed, with costs. All concur.